

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, NY 10278*

January 6, 2025

**BY ECF**

The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Sean Smith, a/k/a "Sticky,," * 23 Cr. 99 (LJL)

Dear Judge Liman:

  The Government respectfully submits this letter in connection with the sentencing of the defendant, Sean Smith, which is scheduled for January 13, 2025. For the reasons discussed below, the Government respectfully submits that a sentence within the stipulated Guidelines range of 41 to 51 months' imprisonment is warranted in this case.

  **I. Background**

   **A. Factual Overview**

  From 2017 to 2023, Smith was a member of Sev Side—also known as DOA ("Dead on Arrival" or "Dumping on Anyone")—a violent street gang. (Presentence Investigation Report, dated September 18, 2024 ("PSR") ¶¶ 24, 30). During the six years that Smith was a member of the gang, he helped support the gang financially through a fraud scheme that, as discussed below, was closely intertwined with the gang's acts of violence (PSR ¶¶ 25-28, 34), and held guns for himself and for other members of the gang so that they could commit violence at a moment's notice (PSR ¶¶ 35).

  Sev Side is a street gang that operated primarily on 187th Street between Park Avenue and Southern Boulevard in the Bronx. (PSR ¶ 24). Members and associates of Sev Side had rivalries with several other street gangs, which often resulted in acts of violence, including murders and attempted murders. (PSR ¶ 26). In connection with their attacks on rival gang members, Sev Side members traveled together to rival gang territories to "spin the block," meaning to shoot at gang rivals and others located in the rival gang's territory. (PSR ¶ 26). Moreover, Sev Side members have glorified their own violence on social media and in rap music and have instigated violence in their own neighborhood and beyond, endangering everyone in the community.

Hon. Lewis J. Liman                                                                                                                    Page 2
January 6, 2025

One of Sev Side's main sources of income was bank fraud. (PSR ¶ 25). Members and associates of Sev Side engaged in bank fraud by obtaining fraudulent checks, depositing them into bank accounts of other individuals (typically with their consent), and withdrawing the funds before the victim banks recognized that the checks were fraudulent. (PSR ¶ 25). By using other people's bank accounts to accomplish the fraud, members of Sev Side were able to obscure their role in the scheme and avoid apprehension by authorities. Sev Side members recruited these other individuals to allow their bank accounts to be used as part of the scheme, typically through postings and messages on social media. (PSR ¶ 25).

Some members of Sev Side are rap musicians—most notably, Kevin Perez, who goes by the name "Kay Flock" and is well known within the drill-rap scene for his music. (PSR ¶ 27). Perez and other Sev Side members frequently rapped about their gang rivalries in songs and videos posted on various media platforms, including YouTube, Apple Music, and Soundcloud. (PSR ¶ 27). These members also posted—on their own social media accounts, stories and live streams—about their gang rivalries and specific disputes with rival gang members. (PSR ¶ 27).

Following several gang-related shootings, some Sev Side members rapped about their violent acts in raps songs which they then posted on YouTube, Apple Music, and Soundcloud. (PSR ¶ 28). The violence and rap music were closely linked: in the eyes of Sev Side members, committing a shooting made a subsequent rap song about that shooting more "authentic," and thereby raised the status or "clout" of the rapper boasting about the shooting. (PSR ¶ 28). In turn, the boasting in the rap songs fed a cycle of violence where the rival gangs retaliated against each other for perceived slights. (PSR ¶ 28).

The acts of violence, and the rap songs boasting about them, were also closely related to the bank fraud scheme. (PSR ¶ 28). Sev Side members who raised their status—including their clout as a rapper—by committing shootings were able to use that status to recruit individuals for the bank fraud scheme. (PSR ¶ 28). Some of the money that was made from the fraud scheme was then used to purchase studio time or apartment rentals for Sev Side members to record songs and music videos (in which they, again, boasted about committing acts of violence). (PSR ¶ 28).

Smith's conduct during the conspiracy period exemplifies this ecosystem. Throughout the period of Smith's membership in the gang, he was one of the most prolific fraudsters in the group. He used his platform on Instagram to post, almost daily, advertisements to get others to send him their bank cards so that he can deposit and cash out fraudulent checks. Below are some examples of his posts:

Hon. Lewis J. Liman                                                                                                     Page 3
January 6, 2025

  

He used social media to generate leads for his financial fraud scheme—from which he made hundreds of thousands of dollars during the conspiracy period.

Smith leveraged his membership in Sev Side to gain a wide audience for his social media accounts, which he then used to recruit others for his bank fraud scheme. For example, he starred in a popular video on Youtube on which he walked around the neighborhood where Sev Side is located describing to the audience were Sev Side started.  That video has garnered over 150,000 views with a link to Smith's Instagram Account.



Hon. Lewis J. Liman	Page 4
January 6, 2025

Smith also regularly posted pictures of himself with other Sev Side/DOA members, promoting his membership in Sev Side/DOA.



In particular, Smith posted himself in connection with the music video shoots to promote the music of Sev Side members. In this way, Smith raised his own profile on social media by connecting himself with the popular music of other Sev Side/DOA members.



Hon. Lewis J. Liman  Page 5
January 6, 2025

The music that makes Sev Side/DOA popular is often about gang rivalries and the ensuing violence that in fact resulted in real bloodshed. For example, Smith posted the below picture of himself flashing a gun sign with Kevin Perez, the leader of Sev Side, who was flashing the Sev Side gang sign. Smith also posted the following quote "fuck the diss, imma act the fuck up, everything dead, I ain't dapping him up" from one of Perez's songs called "PSA," in which Perez ended this particular line of lyric with "everybody shot," meaning Perez intends to retaliate any perceived disrespect by shooting.



To complete the circle, Smith used the fraud proceeds to contribute to the popularity of Sev Side members' music by paying for things like studio time and Airbnb rentals where the music videos were shot.

In short, Smith is intimately involved in the violent ecosystem of the gang. In addition to promoting gang violence online, Smith is mired in violence in his offline life as well. Smith was present when other gang members described their intent to go "spin" the blocks of the rival gangs. And Smith himself possessed firearms. For example, on August 19, 2022, while he was playing dice with other Sev Side members outside in Sev Side territory, Smith kept a loaded firearm nearby, likely in the event that rival gangs came to shot at him and other Sev Side members, they'd be able to quickly retaliate.

Hon. Lewis J. Liman                                                                                              Page 6
January 6, 2025

### B. Relative Culpability

Relative to his codefendants, Smith's culpability falls below those who committed shootings but higher than that of co-defendant Jossi Castro, who was another fraudster in the group. Smith is a long-time and prolific member of Sev Side whose financial contributions to the gang promoted Sev Side and the violence that it generates. Smith's Guidelines range reflects this relative culpability. He is facing 41 to 51 months of incarceration, far below the Guidelines ranges that apply to his co-defendants who committed gun violence.

## II. Discussion

### A. Applicable Law

Although *United States* v. *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. A Sentence Within the Stipulated Guidelines Range of 41 to 51 Months' Imprisonment is Warranted in this Case

The Government respectfully submits that a sentence within the Stipulated Guidelines Range of 41 to 51 months' imprisonment is necessary to reflect the seriousness of Smith's conduct, promote respect for the law, provide just punishment for the offense and sufficient deterrence.

First, a sentence within the Guidelines is necessary to reflect the seriousness of Smith's conduct and the harm that he caused the community and to promote respect for the law. There is no doubt that Smith's actions caused financial harm to the banks he defrauded and also the people whose checks he stole and then repurposed. Even if the banks eventually returned the money back to the check holders' accounts, those people nonetheless suffered injury—perhaps their utilities were suspended or they were hit with late fees when their checks never arrived.

But Smith's crimes did not end at financial harm. He used the money he made to enrich not only himself but a gang whose claim to fame is that they were "DOA," dumping on anybody, and "EBK," everybody killers. Smith promoted and enabled other Sev Side gang member's violence, turning his and others' communities into hotbeds for violence, where teenagers socializing outside their building on a hot summer night might get shot.[1] Furthermore, Smith was no innocent bystander to the violence. He himself was arrested with a loaded firearm while playing dice outside. His actions, along with those of his fellow gang members, terrorized neighborhoods.

Second, a sentence within the Guidelines is also necessary to deter the defendant. The instant conviction is the defendant's seventh conviction and fourth term of significant imprisonment. His most recent term of imprisonment was for 18 months. His parole expired in March 2022. Yet just one month after his parole expired, he was posting on Instagram recruiting people to his bank fraud scheme. And just five months later, he was arrested with a loaded firearm. Moreover, the defendant's argument that the need for deterrence is diminished in light of the defendant's age—35—is undermined by the fact that the defendant was engaged in the offense of conviction less than two years ago. Accordingly, in light of the defendant's criminal history, a sentence within the Guidelines is necessary to provide adequate deterrence.

Finally, the Government's sentencing recommendation takes into account a number of mitigating factors, including the circumstances of Smith's upbringing, and the conditions of confinement at the MDC.[2]

---

[1] On June 20, 2020, Perez and others were involved in a shooting outside a residential building, where four people, including a sixteen-year-old girl, were hit.

[2] Under the new First Step Act rules that give greater credit if the defendant maintains low or minimum risk status, a sentence of 41 months may result in a release date as early as March 23, 2025, and a sentence of 51 months may result in a release date in October 2025. A sentence of 36 months, requested by the defendant, would essentially result in time served.

Hon. Lewis J. Liman  Page 8
January 6, 2025

### IV. Conclusion

For the reasons set forth above, the Government submits that a sentence within the stipulated Guidelines range of 41 to 51 months' imprisonment would be fair and appropriate in this case.

Respectfully submitted,

EDWARD KIM
Acting United States Attorney for the
Southern District of New York

By: __/s/_____
Elizabeth Espinosa / Jim Ligtenberg /
Ni Qian / Patrick Moroney
Assistant United States Attorneys
(212) 637-2216 / -2665 / -2364 / -2330

cc:   Andy Patel, Esq. (by ECF)